Good morning. My name is Jeff Herman on behalf of Appellant Jane Doe. I'm with the firm Herman Law. May it please the Court. I represent Jane Doe, and Model Mayhem is an ISP that under the CDA is immune from suit for acts that they do or omit that are related or invoke their role as a publisher. On the other hand, Model Mayhem is liable and is not protected from suit for acts or omissions it takes that are not related to its role as a publisher. There's sort of a line, if you will, and this side of the line are acts and omissions that ISPs undertake that relate to or invoke doing something as a publisher. On this side, there is no liability for torts that are unrelated to doing something a publisher would do. And this is a side with the American flag, so I'll take this side. Now, I think the MySpace case really lays this out and sets really a roadmap here that the Court can follow, because we had similar facts in that there was a harm to a user on the site. But in MySpace, in both cases, the Court talked about the fact that even though the victim there was alleging that what MySpace was doing was not publishing-related, it really was. It was just a label, but what they really were doing, what they were asking for MySpace to do, was actually to edit content or restrict content to do something to invoke age verification. What our case is about is very different. What we're saying the tort committed here was is that Model Mayhem had superior knowledge that their consumers, by becoming consumers, were at risk, at very serious risk of harm, and that their tort that they committed was failing to warn. Failing to warn does not invoke the publishing side of things. What triggers the duty to warn? Foreseeability, which really is. What action by defendant triggered the duty to warn? Wasn't it publication? No. No. It's information that Model Mayhem received that they had superior knowledge of that their customers were being targeted by these rapists. That's just to. Sorry. Suppose a third party had the information. I mean, there were presumably, because individuals had been identified, there were probably law enforcement officers who had that information. Did they have a duty to warn your client or the community about the problem? No. Why not? Because they were not in a special relationship with my client. What was the source of the relationship defendant had with your client? Business and consumer. The courts have recognized. Doesn't it all derive from the publication? They're all there because they're posting this. They're operating, in this case, an electronic version of the old bulletin board or the electronic version of want ads in a publication that goes to aspiring models. It all seems to me to derive from being a publisher. That's what starts this whole thing off. It's true that they're on the site. It's an Internet site. But you can't. But they also are a business that has consumers. And just because the Act uses the Internet doesn't mean they're immune from liability. I mean, the Ninth Circuit talked about that in Barnes. Just because in the Barnes case, there was a – it was an Internet service provider. It was a second promissory estoppel. I mean, in that case, had they not – in the Barnes case, had there not been the publication, derogatory information about this person, of course, there would be no claim. But the tort there was the secondary contract of promissory estoppel to remove it. And there's nothing like that here. There's no other communication. There's no promise by defendant to your client of any nature, is there? No. No. But it all goes from the beginning. The only relationship I understand there to be between the defendant and your client is the fact that your client went to defendant's website and saw the information that had been posted by somebody else. Am I missing something? I'm sorry. Can you say that again? Your client went to defendant's website and saw the information that had been posted by the bad guys whose names I have not remembered. Right. Okay. Not correct. Let me just clarify that. My client became a consumer and posted her information on the website, which made her target the perps. The other way around. Yeah. The perps then contacted my client outside of the website, frankly. So the relationship is still the same, though. Your client goes to the website, posts her information so she can be contacted by somebody else. Right. But if you look at what we're alleging the failure to do, it's not publisher-related. Just because my client is on an Internet site and gets harmed doesn't mean they're immune from any kind of suit. You have to look at what the tort is. What is the warning that you would put? Right. Well, the warning could be many things. The simplest thing probably was an e-mail to the consumers when they joined the site saying, hey, there are these two men who are pretending to be agents that are inviting girls to Miami, and they're promising to do a Bacardi commercial, and they're drugging them, and they're raping them. This is information the model mayhem had that my client did not have. And so because of the special relation, because they're a business, and my client's a consumer who becomes at risk because she joins their site and is now a target, there is a duty to warn her of a known harm, a very specific harm. You keep talking about the fact that they're a business as being distinct from their being a publisher, but their business is publishing. There isn't one without the other. Well, but that doesn't give them immunity, Your Honor. And here's why. I mean, if you take the Barnes case, their business was being an Internet business. Being an Internet business, as the Ninth Circuit has said, doesn't – does not just blanket immunity. You have to look at the acts. But we don't have the promissory estoppel here. We don't have that direct conduct that gave rise to a contract. Right. Promissory estoppel is one tort that you could argue is outside of the roles of publisher. You could have – Promissory estoppel is actually a contract claim. I'm sorry? Promissory estoppel is actually a contract claim. Right. That's what makes it different. Right. It was a contract case. In the Lansing case against Southwest Airlines, the argument there was that there was an employer-employee relationship. The Internet was being used. The court said they're an ISP, but the tort committed was failure to supervise. And so I think when you look at – if you look at what we're alleging that they failed to do versus what happened in my space, what we're alleging that Model Mayhem failed to do here was to warn. Warning – sending an email or warning the consumers does not invoke any acts that a publisher would do. We're not saying that it – What gives them a duty to warn that the law enforcement officer didn't have? The duty is derived from their relationship, their special relationship with their customers. And what's that relationship? The relationship is a member of their Internet site. And that does not give them immunity to be sued by their members. What service do they provide to your client or other members? Well, the service is – it's a posting service. I agree. But we're not – we're not restricting that. Isn't that activity as a publisher? But that's not where the duty derives from in terms of the tort. They don't post your client's information. They have no obligation to warn her under your theory. The law enforcement officer has no obligation because the special relationship that you use to draw the distinction is a special relationship that constitutes the publication of your client's poster. See, but we're not asking – and let me approach this with sort of the congressional intent here and to avoid a chilling effect on content. In MySpace, there would be a chilling effect on the content because they were asking or they're suing MySpace for failing to restrict communications, to put in age verification software, et cetera. That would restrict communication. We're not saying they failed to do anything with the content. Mile mayhem. What we're saying is – The statute doesn't say that this immunity applies to something that would affect the manner in which somebody publishes, does it? Well, the Ninth Circuit – You're advocating that as the – as what the statute says, but what does the statute actually say? Well, I mean, the statute's been interpreted. I mean, it's more than what it was originally, but the Ninth Circuit says – In what?  Barnes doesn't do it for you. Well, Barnes says you have to look at what the role is of the ISP. Because in Barnes, there's a separate relationship. There have been affirmative communications. There is a promissory estoppel claim that derives from an alleged promise contract between the sales representative for Yahoo and the plaintiff. You don't have anything here. The only relationship you've identified is the fact that defendant has posted your client's information, which strikes me as publication. Well – You've got a different theory of law, but the theory of law all revolve around the same activity on the part of defendant. Respectfully disagree, Your Honor. We're not – And you're free to disagree. Your problem is that if you don't persuade me and my colleagues, then your disagreement doesn't get you anywhere. So why should I think something differently? Okay. Because all the case law says you have to look at what's being alleged that they failed to do or not to do. Is that content related? Does that invoke their role as a publisher? We're not saying they should have not allowed my client to enroll as a member. Can you point me to some authority that involves somebody who is acting as a publisher who is held not to be covered by this statute or by the immunity under this statute because of what you're arguing? I mean, it may be the case. I mean, the Lansing – it's not in the circuit, but the Lansing v. Southwest case involved a flight attendant who was harassing a consumer on the airline. And the courts – they said – the courts said, look, because they use the Internet here, we're going to treat Southwest as an ISP. But the tort is aside from their role as a publisher. The tort is they're failing to supervise an employee. Since that tort is separate from what's going on, their role as a publisher, we're not saying edit anything. It's the role of, in that case, Southwest as employer. Yes. What role does the defendant here have? It doesn't have a connection with the bad guys. No. So it's not a failure to supervise the bad guys claim. No. It's a business owner. They have consumers. This business owner isn't where the line gets drawn. It's not the case that the act doesn't protect business owners. So what relationship does defendant have with the bad guys as was the case in the Southwest Airlines case where the relationship was between the bad actor was an employee of Southwest and Southwest was charged for not supervising his person? Well, I don't think we can allege that. I mean, they certainly could have done things to the bad guys, but then that would invoke editing content and that would invoke the immunity under the CDA. We're not alleging that. It would have been nice for them to do something, but they're not obligated and they can't be sued for not doing that. But I believe they can be sued for not warning their customers who they know when someone pays them or when they – I'm not sure they pay, but when someone joins their site, they know they have this specific unique information or information our clients don't have that puts them at risk. And because they have that superior knowledge, they have a duty to warn their customers. The thing that creates the risk is the putting of the information on the site. Yes. But they can solve that problem without having to do anything that's publisher related. We're not saying they should restrict the communications. We're not saying they should take down our – put kind of verification software on their site. We're saying if you know your consumers are being raped by these guys and this scam, warn your customers. It's very simple. And here's why it doesn't have a chilling effect, because we're not saying alter your content. We're not saying model mayhem. You need to do something to the content that's coming on your site in order to make it safe. What we're saying is aside from your content, when you know women are being raped on your site, warn them. That's it. It doesn't change the content and it doesn't restrict the communications. They're free to communicate whoever they want. And I understand that the relationship is an Internet site and it's an owner versus a member, but I don't believe that just because they're an Internet site and these women join the site that that gives them the immunity. I do think that the relationship that's created is they're advertising this site. They're trying to attract models to join their site. They know that when the models join their site, their target, they're now targets to these two men specifically. And so I do think that's a special relationship that has fallen outside of the intent and of the language of the CDA. And I'll reserve my last minute. Kennedy.  Thank you. We'll hear from the defendant. Good morning. May it please the Court. Wendy Giberti on behalf of Appellee Internet Brands, Inc. Before I reach the issue of the bar provided by the CDA, I want to talk very briefly about the special relationship that the Court has already questioned the appellant about. What's interesting in this case is his argument's a little bit circular. They have a special relationship because she's a member of a website that my client publishes, but they are not seeking to hold my client responsible as a publisher. It seems implausible to make that argument in an attempt to avoid the CDA. To answer your question, Judge Clifton, there are no cases reported anywhere in the United States in which a publisher had a duty to publish something in order to warn its users about a potential crime that may or may not be committed by a third party other than the publisher. The Lansing case, moving to the CDA, is exactly that. It's a, if that's the closest case they have, that's an employer liability case. And the Barnes case, as you know, specifically said the tort claim, they had a tort claim and a contract claim, they specifically said the tort claim was barred. In that case, what's interesting, it's very similar to what he's arguing here. In Barnes, it was a negligent undertaking. And they tried to argue around the CDA and say it's not in their role as a publisher, but they negligently undertook or failed to undertake to remove the photographs from Yahoo. What the court said in that case was the tort of negligent undertaking doesn't stop there. Negligently undertook to do what? Or negligently failed to undertake to do what? A failure to warn is similar. Failed to warn what? And how did we fail to warn? Okay. Explain how this works. The model does what and the website does what? The website is a forum. It's what's called a forum-based website. Users, models, photographers, makeup artists, hairstylists, anyone tangentially involved in that industry can sign up for an account. There are free accounts. There's a Tier 1 account, a Tier 2 account that you pay for. You can ---- It's basically a commercial Facebook, right? Correct. It's a social and professional networking site. But let me ask you something about it. I can see how the statute would clearly apply if the bad guys put up their information and it lured people. But if you look at the language of the statute, no provider of an interactive computer service shall be treated as the publisher of any information provided by another information content provider. That seems to me to mean that if the bad guys put stuff up to lure people in, your client wouldn't be liable. But under this negligence failure to warn theory, it's not the plaintiff's information that she put up that is leading to the liability. And I'm not sure that that falls under the information provided by another information content provider language of the statute. Do you see the distinction I'm making? I do see the distinction you're making. Why does that cover it under the statute? For two reasons. And I'll come back to the first one under Section 1. But also under Section 230C2, and also under 230E3, under 230C2, as interpreted by this circuit and by California courts and by every other circuit that's looked at it, those provisions include liability for editing, removing, altering, or choosing to publish information. So, for example, using your example, if bad guys had posted something on the site and Internet Brands did not take it down, they still would not be liable. Clearly. Internet Brands does not have an affirmative obligation to post something that says if you, Jane Doe, would be model, would be whomever, post something, you may be at risk for X. We do not have an affirmative duty to publish additional information, in this case a warning. Is that based on this statute and the purported immunity from the statute? Or is it general proposition of law there's no such duty? It's both. Well, right now we're focused on this statute. And you look at the statute, and to add to Judge Kogan's inquiry, I mean, this section starts with protection for good Samaritan blocking and screening of offensive material. And the history makes clear that this statute arose out of a decision in New York that might have led to discouraging the operators of websites and bulletin boards from trying to protect other people by getting engaged in blocking some messages and so forth. And the court in New York had said, well, if you start picking and choosing, suddenly you're making yourself responsible for the information. And so Congress passes this thing to make it possible for someone to be a good Samaritan. Why should we use this as an all-purpose get-out-of-jail-free card for anybody who happens to be operating a website? Well, that is specifically – it's not a get-out-of-jail-free card, but for the most part it's specifically what was intended by this statute. You see a lot of language at the opening of almost every case involving a CDA defense where the justices say this is strikingly different from common law defamation or other tort law, but this is the law we have before us. Well, your client is not responsible for what's said, but as – I mean, we can look to the language of the statute, not just the heading. I don't recall whether Judge Kogan read it to you, but it's pretty short. And okay, so your client isn't to be treated as the publisher of the information, but how is its publishing of plaintiff's posting the source of liability? If it's not the publisher, it's instead being cited only for not having communicated specific information that it had or at least alerted the users of the website to this risk. How is that derived and protected by the language of the statute? Because the language of the statute protects the publisher in all of the duties that are typically engaged in by someone who publishes. It's really not that broad. I don't know, maybe I'm reading it wrong, but it says they won't be treated as the publisher with regard to information provided by somebody else, so that whatever somebody else gives them, they're not responsible for. That's not to say that they're not responsible under other theories that really don't get published for information that is not published by them. You see the distinction? I do see the distinction, and what I am arguing is that under subsection 2 and under the unanimous authority interpreting that, the courts have found that those activities are also protected under this act because it is a function of a publisher, as one would typically expect. What you are saying is we expect you to publish certain content, and that is an obligation that Congress did not intend to impose upon these Internet providers, and the reason for that is very simple. If they were to impose that duty, then every website would have an obligation to police every post and every action by every user. For example, to use Appellant's idea that we could have sent an e-mail, my client could have sent an e-mail, for example, warning that it had knowledge of a crime that existed in the past, which is all that's alleged in the complaint. The user base, as you can imagine, for a site like Model Mayhem, similar to Facebook or any of these other social and professional networking sites, changes by the second. So then what do we send? An e-mail every second to every user at that moment? No, but his theory is not that broad. His theory is when you have hard information that posters are being preyed upon, then you should send a blast out to your entire network saying we have information that posters are being preyed upon. Now, I agree with you. That may not be a good idea. It may be too burdensome, but I'm just not sure it's reached by this particular statute. And you say it is under C-2. And under, again, the unanimous authority, I was looking for it very quickly. I know they discussed this specifically in Green v. AOL. I believe it's in the Doe v. GTE case. We can provide a letter copy of that to the Court later if you'd like that citation. But I also want to address two points that you raised with that question. Finishing the point I was making is what you will do is you will disincentivize websites from taking the very action the Act encourages them to take. If you suddenly have a duty to, if you now are imposing a duty to warn on an Internet company because of knowledge they may have, the first thing they're going to do is bury their head in the sand. I mean, it's going to disincentivize them to be aware and to watch the site for things they may want to remove. This claim appears to exist only because your client affirmatively displayed its knowledge by themselves suing the company they acquired the website from and expressing concern about the civil liability they may be forced to bear. I mean, in most cases, it's going to be pretty difficult to prove knowledge on the part of the website operator, but that's not an issue here. Your client affirmatively volunteered its knowledge, didn't it? Well, I ask you to take judicial notice of the complaint that is referred to in the briefs because it does not say what the briefs purport it says. That lawsuit, which I prosecuted, so I know, dealt more with the reps and warranties going to goodwill. We are familiar with the CDA and understand there's not liability on the underlying claims, but nonetheless, as you can imagine, certain law firms, when they bring these claims, make a lot of publicity about it. And suddenly, you may recall the Craigslist killer, for example. I'm sure that didn't help the Craigslist brand for a long time. We don't want it out there as the model mayhem rapists. It's bad for business, so to speak. And the actual knowledge that is alleged in the complaint, in the complaint underlying this action, putting aside the action that Internet Brands filed against the sellers, alleges only that Internet Brands was aware of five other crimes that occurred prior to this for which the individuals at that time were incarcerated. Internet Brands had no knowledge, and they don't allege Internet Brands had any knowledge of an ongoing criminal activity. For the first time today, appellant's counsel stated before this court also, I'd like to add, that his client, and it's not in his complaint, you will see that, his client didn't even meet these individuals through ModelMayhem.com. What they have done is they have pled these things were happening on ModelMayhem.com. My client was a member of ModelMayhem.com. My client was also victimized. They never alleged it was through the site, because it wasn't. And appellant has admitted that here today. So I think that's an important factor in terms of the allegations pleaded in their complaint. And the last point I want to make is back to your original point about the duty. Ordinarily, one does not have a duty to warn another unless there is, in fact, a special relationship. And in this case, there simply isn't one. As the district court in this case pointed out, the relationship, if any, arises out of Internet Brands' obligations as a publisher. So even if that gave rise to a duty, that claim is barred by the CDA. Any other questions? Apparently not. Thank you. Thank you. Just to clarify, what I was trying to say is that the perps did not have a posting on the Internet site, and so they contacted my client through the site. That's how they found her. But it wasn't through sort of because there are people like the perps pretended to be who actually have postings, which they didn't do in this case. But in any event, Your Honor, I tried to – I thought about your question some more, and I looked back at the Barnes case. And I think I understand where your question is coming from, and I hope I have the answer to convince you why you should change your mind. I'd like to hear it. Okay. Page 1102 of the Barnes case. The Court says, What matters is whether the cause of action inherently requires the court to treat the defendant as the publisher or speaker of content provided by another. To put it another way, the courts must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a publisher or speaker. If it does, it precludes liability. So your question to me is, well, where does the duty come from? And it's not as simple as, well, my client becomes a member of an Internet site, so there's a duty. We have the second piece of the court here, which is that the defendant acquires superior knowledge that my client is in danger. And so simply by being a member, there is no duty. And so we're not saying that. We're saying, though, now they have this relationship. My question is to the second half, except that somebody else has the superior knowledge. Does somebody who has superior knowledge have a duty if the first part, the member or publisher relationship, doesn't exist, which is why I pose the question, suppose it's a law enforcement officer that knows about this, got the information, doesn't have the relationship because it's not a publisher. What makes that party liable? Okay. It is because they're now in a relationship as a business owner and a consumer, which happens to be the Internet business. But just because it happens to be the Internet business, they're not protected from a claim for failure to warn in these specific facts. And I urge you to kind of think about that distinction, because this we're not – and we're not suggesting they have a duty to police everything that comes in their site. We're saying they have very specific knowledge. Once they gain this specific knowledge that these people are in danger, they have a duty to warn, not because they're an Internet service provider, but because they're a company with consumers who become in danger because they become their customers. Thank you. Thank you. We thank both counsel for your helpful arguments. The case just argued is submitted.
judges: Cogan, Schroeder, Clifton